Both. Thank you. Reserve decision. The next matter on our calendar is United States v. LaVellius-Purcell. Thank you. Good morning, counsel. Good morning. May it please the Court. Yon-Chan Lee, Federal Defenders of New York for Appellant LaVellius-Purcell. We've raised a number of issues on appeal, but in the limited time that we have today, I'd like to focus on the sufficiency arguments, in particular on count one, charging Mr. Purcell with enticing three specific women to engage in prostitution, count two, transporting — mannack transportation of one woman for prostitution, and finally, my biggest ask, which is count five, the forcible trafficking of another woman. And we respectfully submit that although the evidence is certainly sufficient in general to find that Mr. Purcell is a pimp who trafficked women across the country for prostitution and who occasionally used violence, we respectfully submit that on the specific counts on which he was tried, on which the government alleged he committed specific crimes against specific women, that the evidence isn't sufficient on either venue or one or more of the elements of these offenses. Count one — I'll start with just in order. Count one, which is the enticement count. Venue in the Southern District of New York is missing as to all three of the alleged victims. It would have to be missing as to all three, or at least venue could be missing as to the second and third victims, but as to one of them, it could be deficient for other reasons. But it has to be insufficient as to all three victims. That's right, Your Honor. As long as the evidence of venue or whatever else is on one, that's good enough. The government would prevail. But as to all three, the — all three of the — the crime, right? And the crime here is enticement, persuasion to engage in prostitution. And — and for all three, that essential act did not occur in the Southern District of New York. Alcantara, Detective Alcantara, is the obvious — is the easiest one here. She's the — the undercover North Carolina detective. Everything about her occurred in Charlotte. I mean, there's no evidence of anything regarding her that occurred in the Southern District. And so that's out. Regarding Allwell, that's the woman in — who lived in Rock — in the Rockaways, which is in the Eastern District, and — and she met with Mr. Purcell and tried prostitution one weekend in Hempstead, Long Island, also in the Eastern District of New York. That all occurred, nothing in the Southern District. And then finally, Vasquez. And — and Vasquez is also the only victim on count two, the transportation count. As to Vasquez, the only evidence we have about her — so she did not testify, and there was no witness who actually knew her. And so all the evidence about her came in through documents, which certainly a jury could find that she was a prostitute, and she went around the country, and that Mr. Purcell was her pimp, no doubt. But is there any evidence that he enticed her in the Southern District of New York? None whatsoever. So the evidence on count one is insufficient on that. And also, as to Vasquez, on count one, the evidence of the critical element of enticement is — is also missing. Again, we know that she was a prostitute and that we know that she worked with Mr. Purcell, no doubt. But we have no idea how that relationship came to be. And enticement is an element. The defendant has to do something. And we've cited cases that say that merely asking someone to engage in prostitution doesn't qualify. The enticement persuasion — Kennedy. Mr. Leavitt, you make a strong argument as to count one, but that's taken already, it looks like, half your time. Leavitt. Okay. Let's go to — Can we go to count five that carries the sting in this case? Yes. So let's go to count five. My biggest ask and also the closest question here. So this is forcible sex trafficking. And there are many elements of the offense, but the one that's in dispute and that we submit the evidence is insufficient is on the — is the element of coercion. And coercion requires both the defendant to intend to coerce and also that the — the person so coerced reasonably  aware of what she knows, reasonably believe that she was being coerced. He did. He took out all her belongings. I'm sorry, Your Honor. He took all her belongings. To me, we're talking about count five. Yes. Ms. Wood. Yes, Ms. — that's Marianne Wood, the woman who — So he took all her belongings. He took her phone. He didn't let her go anywhere else. Sounds to me like she knew she was being coerced. Your Honor, this is — so I would say about this is that the government alleges coercion occurred at sort of basically two distinct stages, or there are two factual theories of coercion. First, that she was kidnapped from her hotel room in Queens, and then second, after that, that she was then coerced to travel to Pennsylvania and engaged in prostitution. So if we start with the first one, which is the easiest one, this idea that she was kidnapped, patently false. There is no evidence that supports it. There's certainly no reasonable verdict of proof beyond the reasonable doubt in that one. I mean, I think you have a very good jury argument on that. It's a triable case, for sure. But I've never tried a trafficking case. I've tried a lot of extortion cases, organized crime cases, loan sharking cases. And this sure sounds a lot like that, where some guy comes to you and says, you've got a nice business here, and it would be a shame if anything happened to it. And, you know, we know a lot of people in the neighborhood, and we can kind of watch out for your business and make sure nobody breaks all the windows. And all you have to do is pay us a fee for that service every month. And the person is very polite and very smooth. And when you cross-examine, when the defense lawyer cross-examines the victim, the question is, did he ever raise his voice? Did he ever, you know, explicitly threaten that he would break any windows or do anything to you or get people to do? Oh, no, no, no, never said anything like that. And those cases result in convictions all the time. And indeed, one of the things that comes up is the victim is thinking about that man's reputation or about the way people like him operate and do extortion rackets. And here's a woman thinking this is how pimps operate. And here's a guy who is, a jury could reasonably conclude, intentionally exploiting that knowledge. Your Honor, there are vast differences between that scenario and this one. So the first thing I'd like to point out is that at page 179, 180, and 81, I think somewhere in there in the trial transcript, she says several times, and this is uncrossed, I did not feel like I was being taken. She says that. I did not feel like I was being taken. And I submit that where the only evidence of coercion comes from the words of the witness, whatever contrary testimony she may give later, that, I submit, Your Honor, just cannot be proof beyond a reasonable doubt. When the victim herself says, I did not feel like I was being taken. And as to the vast differences between this case and an extortion case, Your Honor, she admitted again, she invited him. She gave out, she's a security conscious person. She normally doesn't give out her room number to the hotel. But she gave her room number to him. She invited him to come. Well, but who initiated the contact? She wasn't looking for a pimp. She didn't put out an ad in the online saying, I'm looking for a protector. I'm coming to New York. My old pimp won't work with me anymore. We don't. There's no evidence about that. We have no idea. We know that, we do know that there was some communication, text, phone, or something before they physically met in her hotel room. But we don't know who initiated it. The government didn't provide any evidence of that. So not only did he, did she, at the very least, we know that she invited him to the room to meet in person. And then she pulled out, under a lamp that he didn't know was there, she admitted she had no idea it was there, she pulled out $800 and gave it to him. She gave him all her money. She gave him all her money, yes. But this is, I understand you, this is a very strange lifestyle to me as well. The idea of a choosing fee seems very odd to me. It almost doesn't make any sense to me. But the choosing fee, as the government acknowledges, is money that a woman pays a pimp to be allowed to be on his team. Again, it's a very strange concept to me, but it exists in that lifestyle. Kagan. Didn't Purcell tell Ms. Wood at some point that she had to make at least $1,000 before he would let her go? She did, Your Honor. There's some testimony that seems to suggest coercion. But with that, that, I do think it's the strongest bid on the government's side. But that testimony, and it's in the record, it just comes out of nowhere. We have no idea what the context of that conversation is and what it means, whether it's simply some discussion about how much it costs to sort of extract yourself from this financial relationship that they've created among themselves, that this is a business arrangement in which she paid a certain amount of money to join his team, and then he accommodated her by putting him as part of, you know, team casino. And so there is that statement, Your Honor. But it's not clear from the context what it means. And also, Your Honor, respectfully, it contradicts everything else she says. Whenever she's asked about why you feel, again, there's no doubt she testifies throughout, I felt coerced, I felt coerced. But I would ask the Court to scrutinize the testimony, and whenever she's asked, well, why did you feel coerced, almost every time she says, well, he might have harmed me, I don't know, I don't know, he might have, might, the past tense of may, expressing a sense of possibility, it's a guess. Now, we know. We're the omniscient observer here. We know of all of Mr. Purcell's, evidence of Mr. Purcell's bad deeds and the fact that he's a bad guy. Breyer. Of course, in those extortion cases, it's the same, isn't it, in that the store owner, the business owner, would have to say the same thing. I was afraid this person was going to harm me if I didn't pay. And the jury is entitled to conclude on all the facts and circumstances, beyond a reasonable doubt, that the defendant was exploiting that fear. Yes, Your Honor. Because in that conversation, in that context, the defendant must be aware of that fear and be exploiting it. Wherever it comes from, once the extortionist is aware of it and plays on it intentionally, does nothing to dispel that fear, then we have someone who is exercising coercive power. Yes, Your Honor. But again, the difference here, right, is that usually the extortionist is, you know, a well-known, you know, a Casanostra affiliate or somebody. What's the difference between being a well-known Casanostra person and a well-known pimp? Well — In a world where you have in the defendant's statements a kind of expert testimony about how somebody in that business operates, that he was a nice guy because he didn't beat his workers black and blue. He just slapped them once in a while. But again, Your Honor, respectfully, we know this, right? We know this, and the jury knows this. But there's no evidence that she — There's no evidence that she knows how pimps work. There's no evidence that she knew how — Your Honor, respectfully, pimps operate — I mean, didn't he tell her that, you know, she's in his territory now and she needs protection? How close does that — how close do you have to get to the mafia extortionist? She has — she is not aware. There's no testimony that she's aware of his practices, aware of how he treats women, aware that he's hit any women. This is a — this is a very, very short relationship. This relationship is less than 48 hours, during which she admits, right, and the thing is, Mr. Purcell had no reason to believe that this woman was clearly unhappy with the relationship. She had just given him $800, and the testimony that she never objected, never indicated her unhappiness with the relationship. And as a result, again, she admits that he didn't do nothing to me. He never hit her, never threatened her, never harmed her. And finally, as the government also admits, Mr. Purcell was strategic in his use of coercion. There's testimony from Sharon Orwell, that's the woman in Queens, and then another woman, Alice — I'm sorry, Detective Alcantara, that was the videotape, in which he was perfectly pleasant, perfectly cordial. Because why? Because, again, under government theory, because he had no need to exercise coercion, no need to make the person feel like he's going to — he's a violent or coercive person. And we submit that that's exactly the situation that Ms. Wood, the victim on count five, was in. That she's not — we don't have any evidence that she's aware of his reputation or aware of anything that he had done with other women. And that whenever asked, why did you feel like you were scared or coerced, well, I don't know. He might have done something to me. And that, we submit, is not proof we have. I realize you're well over your time, but can I ask a question about the search warrants here? Because I'm having a little trouble understanding these search warrants as search warrants. So when you look at one of them, say the November 2016 warrant, it's on a form or it follows a form of a typical search warrant. It's addressed to any police officer of the City of New York. And normally, a warrant authorizes a police officer to go out and search a place, go to this house, find the computer that — because there's probable cause that there's child porn on the computer. But here, the officers are not intended to search any place. The warrant specifically says that the court authorizes Facebook to conduct the search of its records, not for the police to go to search book and sit at a computer and find the documents that are covered by the search warrant. But it authorizes Facebook to do it. And it says that the warrant slash order is deemed executed when it's served on Facebook. It's like a subpoena. The agent is really told — I mean, I suppose read strictly, the warrant would authorize the police to do a regular search, to go there and say to Facebook, here's our warrant. Show us where your files are kept. Oh, on that server? Okay. How do I get into it and go through it? But, in fact, it specifically authorizes the police to do something quite else, which is to hand the warrant to Facebook and then go back to the precinct house or the DA's office, wherever they work, and let Facebook come up with the stuff and deliver it. Right? I mean, is that your understanding? That's my understanding of it, too. That's certainly the 2018 federal search warrant. That's — Yeah, but that's not — doesn't seem to be what's at issue here. I'm focused on this 2016 state warrant. That, to me, is clear in that that's exactly what it's doing. It's basically compelling the social — the entity that holds all the information to basically transfer all the information to the police, who would then search it. Yeah. But now what puzzles me is how do we look at particularity in that context? The search warrant to Facebook is very broad. There's no question of that. You say yourself that it amounts to give us the entire Facebook account. Yes. But if that's so, where is the particularity problem? Because Facebook is told exactly what they're supposed to provide. There's no doubt whatsoever. Facebook doesn't have to say, oh, this doesn't have anything to do with prostitution. Oh, this may have something to do with prostitution. Just find the — whatever it is, Mike Hill account, whatever pseudonym it's under, and give it to the police. That's right. So they're not exercising any discretion at all. Well, then neither is the police, right, when they look through it. So I think the new Rule 41 — I know it's not — these are State warrants, but the new Rule 41 also contemplates this idea of this two-step process, that the search warrant to one of these providers is to disclose all the information, and then the sort of particularity in the search terms apply to the agents sort of looking through this stuff. And so here, the problem with the, you know, the first warrant, the August 2016 warrant, and the last warrant, the September 2016 — They don't even mention a crime. They don't even mention an offense. So — But what about the one that does? So the one that does is, you know, it's problematic for two reasons. It's that, you know, semantically it's actually identical. I mean, I'm not trying to be clever, but semantically it's exactly the same as saying — It says including but not — Yes. So you say, you know, you can search for evidence of, you know, prostitution, but — of any offense, including but not limited to prostitution. That's exactly semantically the same as any offense. I get that argument, though. Of course, the government would have a counterargument that it's prostitution — it's this statute and things like it. Well, but that's — it says including — I understand that argument. Yes. And I'll have to grapple with it. Yes. But that's a less interesting argument, and that's one that comes up in any kind of search warrant. What's unique about this is the electronic context. That's what's novel and complicated. And I get also the argument that maybe the new Rule 41 has a better approach by rule. Maybe, yes. But when we're looking at what the Constitution requires, I'm having a little trouble finding an analogy. Like, why is this different than a warrant that says to the police, go to this man's house, find every hard drive and thumb drive that he's got and every computer device that can store data that he's got? That's what you're looking for. That's what you get because there is probable cause to believe that there's child pornography that this person keeps on a computer. Now the police come back to their offices and start looking through the computers, which most likely have lots of things on them, looking for evidence of child pornography. So why is that different than what — putting aside the question of including but not limited to, if the November 2016 warrant is interpreted as limited to evidence of prostitution-type offenses and the probable cause is broad enough to say this guy's Facebook account is basically what he does his pimp business out of, they get — Facebook has no discretion, give the whole account. That's like, find the computer. Now they've got the computer and they're authorized to look through it for evidence of prostitution. Again, putting aside for the moment your other argument, what — is there something — putting aside that argument, do you have some reason to say that the police are not given adequate instructions? Yes, because if you read the warrant, it doesn't say that you're supposed to — so now just looking at the police — it doesn't tell the police just look for evidence of prostitution, okay, so we take out the including but limited. It says all this evidence, which basically, I mean, it's everything in an account. I mean, in fact, the government has to admit that they're asking for everything. Everything. It just says everything constitutes evidence of prostitution. It doesn't say look for evidence that's related to or concerns prostitution. It just says it constitutes, it is evidence of prostitution. Why is that different than the one that says go search for the computers and the thumb drives? Well, but then even then you're still saying, well, but you're limited by sort of these, you know, you're guided in what you're looking for. You're still looking for evidence of prostitution. You're guided by what you're looking for, meaning what the probable cause is about. It doesn't say typically because, again, we're focused on get the evidence, go — we think of it as the place to be searched is the suspect's house. The things to be seized are the computer devices. And there's not a secondary step that says once you get the computer devices, you have to get a different warrant. Or we're saying in this warrant, these are the specific types of evidence that you are looking for, photographs or whatever. It's understood what you're looking for. The difference is that in a good case, you look through all this hard — you're given some instructions about what you're looking for. You're limited — Evidence of possession of child pornography. So yes, you look through maybe — so I understand, you know, you open file cabinets, you have to look through everything. Or if you're looking for hard drives, you've got to look through everything. But only a little bit, right? And so if you're looking for child pornography, you see that these are just, you know, pictures of the guy's dog, then you don't keep looking. But this warrant just says evidence — But you have to keep looking because they're not — you don't know they're all pictures of the dog until you see them all. No, I understand, but let's say — but you don't keep looking if you're sure of it. But this warrant says — it doesn't limit in any way. It just says, well, it's all — it just says it's all evidence. It constitutes — all this stuff constitutes evidence of prostitution. We'll have to move along. Thank you. You have reserved a couple of minutes for rebuttal. We'll hear from the government. May it please the Court. My name is Sebastian Sweat. I'm an assistant United States attorney in the Southern District of New York. I represent the government on appeal, and I also represented the government in the proceedings below. You want to talk about the venue issues? I'm happy to talk about the venue issues. So as the Court rightly noted, there were three victims identified in count one. If evidence is sufficient for any of them, the count stands. I think that — What's your best one? Start with your best one. I will, Your Honor. So Sharon Allwell was enticed as part of a continuing offense by Purcell. He was on the road. He was traveling around with women. He met her, I think, through a dating app and began calling her. He began soliciting her. In fact, he attempted to entice her to travel to Tennessee. He said, come meet me in Tennessee. A woman just left me. One of my girls just left me. So you come out to Tennessee. She said no. So in order to make his enticement more effective, he said, I'm coming back to New York. Well, let's start with that for a minute. Are you saying that that is evidence of — sufficient evidence of venue? Because if she had said yes to what he was enticing her to do, she would have to pass through the Southern District of New York. No, Your Honor. For us, and I don't think Purcell can contest this, in and around all of these events, there's evidence of him driving through the Southern District of New York. That's what you're relying on. Is that enough, in your view, driving through the Southern District to give you venue in the Southern District? Certainly for purposes of Sharon Allwell, yes, Your Honor. Because he has started recruiting her. He has started enticing her, or at least trying to entice her, on the road remotely. But he's enticing her — for all we know, he makes a call from Cincinnati and another one from Nashville and another one from Boston. There's nothing that says he ever made a call while he was in the Southern District of New York or while he was in his car on the way through the Southern District of New York or even when he was on the phone in a car on a trip that, in fact, passes through the Southern District of New York. All you're saying is that he goes to a lot of places and crisscrosses New York while he's doing it. That's not exactly what I'm saying, Your Honor. I'm saying this was a continuing offense. And under Second Circuit law, any act that occurs in a district during the — during a continuing offense gives rise to venue. So what's the act? The act is that he drove back to New York specifically to see her, to recruit her in person. Do we even know that? I mean, he does at some point get back to Long Island and makes another call from there and sets up this weekend. But do we have any notion that he was recently somewhere else and came through the Southern District of New York to get to that — to his house at that occasion? Let alone that that's why he came back, rather than he came back because he was done with his business in Cleveland, comes back to Long Island and then thinks, oh, OK, I'll give another call to Allwell. Yeah, that works. But there's venue anywhere else that he might have driven through on the way? So I think there were about three separate questions there, so let me address them one by one. Do we have evidence that he was somewhere else? Yes. Sharon Allwell testified that he told her he was in Texas, California, I believe. She mentioned a number of states where he reported he was traveling. She also said that he would call her from the car. So her understanding was that he was driving from place to place. He wasn't flying. He wasn't taking a helicopter or anything like that. So I think that answers your question as to was he outside of the district or outside of Long Island. I think there's evidence of that, certainly for purposes of venue by a preponderance. I think the second question was, is there evidence that he traveled through the Southern District of New York to get back? And there, I don't even think Purcell contests that. There was testimony from an agent about how you can get on and off of Long Island by car. There was license plate reader data showing he had made similar trips before. There was testimony from Marie Ann Wood that he had traveled with her across bridges to get from Hempstead, excuse me, to State College, Pennsylvania. So I think the jury could logically infer that his trip from wherever he was, Texas or Florida or what have you, back to Long Island involved travel through the Southern District of New York. And I think the third question is whether that travel itself was essential to the crime, whether it was the motivating factor. And again, I think that Sharon Allwell's testimony, when looking to see if there's venue, establishes that fact. She says, he told me he was coming back to meet up with me. And this crime could have been prosecuted in the Eastern District of Pennsylvania. I realize they don't have a sovereign district in Pennsylvania. But it could have been prosecuted in the Eastern District of Pennsylvania if there was any evidence at all that of his route for this trip. If you somehow Googled his, you know, searched his Google Maps record and found him traversing Philadelphia on the way back to Long Island, the crime could have been prosecuted there. I think if the evidence established that he had begun his enticement in one location and had traveled to complete the enticement in another location, then yes, under Second Circuit law, the continuing offense would have occurred in the Eastern District of Pennsylvania or in wherever else he traveled to make that final step. And where have we held that enticement is a continuing offense rather than a series of individual acts? I mean, you could have, if you were, I don't encourage you to do things like this, but a prosecutor conceivably could charge him with several acts of enticement. And if venue was somehow appropriate, you could say they were all in the Southern District of New York. He called her from the Bronx. He called her from Manhattan. He called her from Rockland County. And he also talked to her in Long Island on one of these, having to do with one of these trips back from one of those other places. Aren't those separate, chargeable counts of enticement? Your Honor, respectfully, I think that when someone is making an attempt to entice a single person, when that person has not succeeded in his enticement, in fact, when she has rebuffed the first request to travel to Tennessee, and then he decides that an in-person meeting is going to seal the deal, so to speak, that when he travels there, that's part of the offense. And would every single call be a separate charge of enticement? I'm not prepared to answer that question, but I do think here the offense committed against Sharon Alwell involved a period of, I think it was several weeks, in which he was trying again and again to get her into this life to travel with him. And frankly, the evidence showed that he at least achieved some level of success when he was in person. And that same theory would cover Alcantara, presumably, of course, right? Because if he starts talking to her from Long Island and then drives from Long Island to North Carolina on the mission to meet her and seal the deal, as you put it, then he could be prosecuted in any state that there was evidence that he traveled through, even if only over the Verrazano Bridge, on his way from Long Island to North Carolina. He could be prosecuted in Virginia, he could be prosecuted in Delaware, Maryland, District of Columbia, any of those places. Your Honor, I think that that's accurate. I think Mr. Purcell presented a wide menu of options because he was basically a 24-7 pimp all around the country. And certainly much of his conduct occurred in and around New York City. There were back page ads, there were Facebook posts, there was ample evidence showing that he was active and prolific here within the Southern District of New York. He was active and prolific on Long Island. He was active and prolific in States all across the country. So, Your Honor, frankly, if there were unlimited resources and unlimited time, there could be charges against Mr. Purcell all over. Do you have a case that says that just driving through New York is enough to put venue in the Southern District? Well, certainly, Your Honor, I don't have a citation, but there are plenty of cases showing that minimal. The cases of Legion, you say?  in that district is sufficient. I think, you know, there are cases in which a phone call is sufficient. There are cases... We've got Marizano Bridge cases and we've got Flying Over the Arrows cases, right? It depends on whether the act relates to the actus reus of the offense. And, Your Honor... Correct? Isn't that correct? That is correct. And that's why I'm focusing on Sharon Alwell because I think it's hard to view his motivation by a desire to seal the deal, to effectuate his enticement. If he had just seen her on Facebook and said, you know, and then ended up in New York and met with her, different case, different factual pattern. But where he's talking to her, where he's trying to get her to meet him in Tennessee, and it doesn't work, and he decides to go back, I think, for purposes of venue, which is a preponderance standard, giving the jury every reasonable inference. It's completely fair to say that when he got in his car, drove back to Long Island through the Southern District of New York, met with her in person, and then, in fact, persuaded her to have to engage in prostitution for one night, that that was part of the actus reus. If he hadn't driven back through the Southern District of New York, likely she never would have taken that step. She never would have met him in person and her life would have been significantly different. So for my purposes, the actus reus clearly occurred in the Southern District of New York. Can you quickly address coercion? Your adversary focused on, you know, her testimony that she never felt threatened, that there was no physical coercion of any sort. Yes. I see my time is up, but I will briefly address it. Let's talk about the facts. She was — she had her phone taken from her. She was told to change her number, and I'm referring to Marie Ann Woods here. She was told that Purcell required his women to abide by a series of demeaning and humiliating rules, that they had to call him daddy, that they had to walk behind him, that they couldn't have any other relationships, that they had to get a tattoo that said King Casino on their neck. He never let her out of his sight. She had to use the restroom. She had to go to the bathroom with the door open. When she was at his apartment, his parole officer came by. She had no idea for what, but she knew that he was someone with a criminal record. She asked him if she could go to a funeral or if she could go to court. He said, I'm coming with you. She — he told her, I might let you leave if you give me $1,000. She was told all the money that she made from prostitution would go to him. She didn't decide that she wanted to go to State College, Pennsylvania. He said, there's a town with horny college boys. That's where we're going. And all of that is — is ample evidence of force and coercion, but if we're really getting to what her state of mind was and whether this was a reasonable conclusion, because I think that's what the appeal focuses on, that maybe she felt scared, but it wasn't reasonable. It wasn't rational. I think you look at the text message that Purcell sent her after she ran away. She ran away, and he sent her a text message that said, I'm going to kill your fat ass, you nasty bitch. Stay away from my city. So I think at that point, the jury, looking at everything she had experienced and then looking at how Purcell reacted when she did disobey his rules, had clear evidence that there was force, that there was coercion, that this wasn't some sort of flight of fancy by — by a fainting lily. This was a serious, serious incident in which she was forced to do something she had no desire to do. Kennedy, could you address the — the search warrants for a moment? Does the third search warrant matter here? Is there something in the record that explains what got produced in response to the third search warrant? Your Honor, in the government's brief, and I'll pull up the page right now, on page 19, it explains what was — what was produced at trial, what was introduced at trial, and sort of the timing of it. So — That's where I would look to find out what's — from what warrant. Now, the government's view is none of the State warrants matter, because Judge Coates signed a warrant in August of 2018. Purcell never challenged that warrant. And all of the evidence that was introduced at trial — Wait. But this is inevitable discovery? That warrant would never have happened if the case wasn't brought to the Southern District of New York by the district attorney's people with their — the evidence that they had collected, right? Your Honor, there was evidence completely leaving aside what was in the Facebook account. There was clear evidence and — that there was pimping activity in that account. And at some point, some — I'm sure there was. But is there any evidence that there was any kind of Federal investigation or Federal interest before what was provided to the U.S. Attorney's Office by the DA based on these warrants? Your Honor, I don't know if that's the relevant question. The relevant question is, A — Why not? Well, you're saying there's — it doesn't matter if these warrants were totally invalid and unlawful, and in response to that, the district attorney gets a whole We think you've got better penalties than we do. Why don't you go and take it? And you go and do whatever you're going to do. That somehow that constitutes inevitable discovery so as to make it irrelevant that all of this evidence came from invalid warrants? I'm not sure — Assuming it does, I mean, that's the question I really want to get to. But I'm a little surprised. Is inevitable discovery the theory you're relying on to tie — to say that Judge Cote's warrant moots everything else? Your Honor, I'm relying on the language in United States v. Johnson. And in that case, the Court said that there are basically two factors in determining whether evidence that was seized illegally in one context but then cured or seized in another context is admissible. And the two questions were, first, did the follow-up warrant in any way rely on evidence that was obtained pursuant to the first warrant? Here, that's not the case. The second — the Federal warrant was completely free of any taint. In fact, all of those public posts were still there when Special Agent Richards reviewed it, collected them, and prepared the affidavit. The second question is whether the agents would have applied for the warrant had they not seen the excludable evidence. And here, I think the answer is that they absolutely would not. They wouldn't even be there if they hadn't seen that evidence. There would be no Federal agents. There would be no assistant U.S. attorney worrying about this case. If the case hadn't originated in the district attorney's office and then developed this body of evidence that gets plopped on your desk. But this body of evidence went well beyond what was in the Facebook accounts. The district attorney's office brought hundreds of back page ads. They had interviews with witnesses who said that Purcell had told them that they needed to be branded. They had evidence that he was pimping and trafficking all around the country that would have led them to bring the case to the U.S. attorney's office in any event. And that evidence, combined with the very public posts that made it clear that this man was a pimp, would have led the agents to take the same step they would have otherwise. Breyer. So that's the counterfactual we're looking at, in effect. And there's no challenge to the Federal warrant with respect to particularity. There's no challenge to the Federal warrant at all. At all. Okay. And could you just indulge me, then, and discuss a little bit with respect to the question of how we're supposed to conceptualize this warrant. If I were forced to decide whether that warrant meets the Constitution's particularity requirement, how do I think about that? Well, Your Honor, I think that the framework that you described makes sense. I think that's right. This was a warrant, essentially like a Stored Communications Act warrant, where Facebook would collect the information and provide it to the agents, or in this case, Investigator DaSilva. The warrant itself says that the 24 categories constitute evidence and tend to demonstrate that an offense was committed, including but not limited to, which sort of set aside, promoting prostitution in the third degree. It then says, you are therefore commanded to retrieve, enter, examine, copy, analyze, and to search the target Facebook account for the above-described evidence. I think it's clear that the above-described evidence is evidence of the crime listed. And so when Facebook goes to Facebook and says, well, we're going to search the target Facebook account for the above-described evidence, wouldn't it be more natural, as Mr. Lee says, to make the antecedent of the above evidence the things that the warrant says are to be seized, which is just redundant? It's all the things that the police are authorized to seize, rather than what they are supposed to look for once they're looking for it. In fact, the warrant does this very interesting maneuver of saying that whatever the agents do once they get the Facebook account is not executing a search at all. It's just analyzing the evidence that has been seized. Can a court do that and sort of preempt any privacy problems or Fourth Amendment problems that might arise in the context of looking at the stuff that Facebook gives them by describing the search warrant as just serve it like a subpoena and let Facebook do the searching? Does that insulate what the police do later from any scrutiny as to have they been instructed to look for anything in particular? I don't think it necessarily does, Your Honor. But again, I think here the warrant itself referenced the particular crime that was at issue. And as the Court has said many times, particularity and overbreadth are tied to probable cause. And here there was vast probable cause. And so I think that the agent had the direction that they needed to search the 24 categories for evidence of promoting prostitution. I think that this was not overly broad. I don't think it was. Breyer. I've always been puzzled about how particularity works in the real world in this context, because whether or not the evidence says including but not limited to the warrant says including but not limited to, the agents are looking. They know what they're looking for. They're looking for evidence of prostitution. And if they find photographs that are not photographs of a dog, but photographs of the defendant engaged in a murder, they can seize that, too, under the plain view doctrine. So I'm not sure what's the difference between a particular warrant and a general warrant in this context that's relevant to this particular kind of search. But the Constitution requires it, and we have to sort of think about what that means. But I understand your argument. Thank you. If there are no further questions. Thank you, counsel. Thank you. Mr. Lee, you have reserved two minutes for rebuttal. Thank you. So three things. The 2018 search warrant, then the venue issue, and then the coercion issue. So 2018 search warrant, we didn't challenge it because there's the government sought this in the middle of the litigation on the state warrants. And I think it came about two weeks or one or two weeks before Judge Coe upheld those state warrants, which obviously rendered sort of any challenge to the 2018 federal warrant moot, right? Why would we need to challenge those? And what the government is, they're essentially using the 2018 search warrant as sort of an independent source is the way we think about it. But to qualify for that, you have to show that the motivation for that was independent as well. And obviously, this is in the middle of the litigation of this particular case. It was motivated by those state warrants. So it's tainted by those warrants. And so the venue regarding Allwell, Mr. Purcell basically sort of lived at least in part on Long Island. So all we knew is that he's traveling around, he called her and he's enticing her. Then at some point, he came to Hempstead. Home. Home, he went home. And then at some point, he then went to the Rockaways. We have no idea that he traveled through the Southern District, even partially motivated by the desire to entice her. And so there's no Southern District venue on that. And this idea of he asked her to travel to Tennessee, that cannot possibly be enough. I mean, that's not the actus reus, and that's just talk, right? And that also, by the way, goes to count two, the transportation. The government wants you to just sort of assume, even though there's no evidence that he transported Vasquez, right? It transported is a transitive verb. You have to take somebody. There's no evidence that he transported her. And the government just wants you to assume that he did because, well, that's what he does. Well, we have evidence right here that that's not always how he operates. He sometimes asks women to travel themselves. But he also arranged for hotel rooms with her on one of these trips. He did, yes, Your Honor. And that's what we think this case Jones in the D.C. Circuit is essentially the same scenario. Transport has a particular meaning, and it's different than enticing or persuading someone to travel. And arranging sort of a deal in which, you know, this is exactly the dispatcher in Jones, right? There's a John, a customer in D.C. He calls the prostitute in Maryland, and then she then travels by herself to D.C. That's not enough. He induced her to travel, but he didn't transport. There has to be evidence of transportation. And finally, as to the coworker. Breyer. Accompanies her, though. That case doesn't involve the pimp or pimp employee escorting the person, even if she uses her own car and drives her own car from Maryland to D.C. Yes, Your Honor. Well, we don't know that. Again, we assume that they traveled together. We know that they went from one to one. There's reservations in one place and then reservations in another. But we don't know how they got there. Maybe they took separate buses. Maybe. But if you just say you say we assume it, don't you mean a jury could infer it? Well, Your Honor, this is a reasonable inference. If you have people going on a trip from point A to point B to point C, and at each point they're staying in the same hotel with reservations made by the same person at the behest not of the woman but of her pimp, that yes, I guess it is conceivable. That they each took separate flights. Maybe they even did that on purpose to not be seen together or something. But that doesn't seem like the most logical inference for a jury to draw. This is where this Court's decision in Pauling comes into play, right? That reasonable inferences are fine, but reasonable speculation is no good, even reasonable speculation. Okay? And there has to be some specific evidence in which you can infer as to how these two people travel. And we just don't have that. Again, it's a good guess. I admit it. It's a good guess. But it's still a guess. And you can't base, you know, you can't convict somebody based on a good guess. And then finally, with regard to coercion, I understand I have an uphill road. But I would say that all these things about, you know, all these little rules and all these things like that, what is the evidence of this? He asked. She agreed. She never objected. He asked. She agreed. She never objected. And she said, when asked, well, what are the, why didn't you refuse? She said, well, I don't know. Maybe he would have heard me. And as for the flight and the final nasty text message, Your Honor, I can admit to you, we can all admit, her guess was right. She was right. But a good guess is still a guess. You know, a broken clock is right twice a day. Okay? And, you know, if somebody looked at a broken clock that they knew and said, oh, it's 2 o'clock, and it happens to be 2 o'clock, she's correct. She was right. That if she refused, some consequence would happen. But it still has to be a reasonable, it has to be a reasonable belief. Her belief that her refusal would result in coercion has to be reasonable based on what she knew. And the evidence is insufficient on that. Thank you, counsel. Thank you both. Reserve decision. I appreciate the arguments. Very well argued on both sides.